## Case No. 16,271.

UNITED STATES v. SHELLMIRE.

[Baldw. 370.] [1]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1831.

COUNTERFEITING—CHECKS ON BANK OF THE UNITED STATES—PRESUMPTIONS—PERJURY.

1. An order or check drawn by the president of a branch bank of the Bank of the United States, on the cashier of the bank at Philadelphia for the payment of money, is an "order or check" within the 18th section of the act chartering the bank. The bank is bound to pay such orders or checks, and the indictment may charge the passing such counterfeit order to be with the intent to defraud the bank, or the person to whom it is passed.
[Cited in U. S. v. Morris, Case No. 15,813.]

2. The law presumes the intention in passing counterfeit paper to be to defraud any person who may suffer a loss by receiving it as genuine.
[Cited in Com. v. Starr, 4 Allen, 305.]

3. Perjury consists in swearing falsely and corruptly, contrary to the belief of the witness, not in swearing rashly and inconsiderately, according to his belief.
[Cited in U. S. v. Moore, Case No. 15,803; U. S. v. Edwards, 43 Fed. 67.]
[Cited in brief in Com. v. Brady, 71 Mass. (5 Gray) 79.]

The defendant was indicted for uttering, passing and publishing as true a counterfeit order, purporting to be an order upon the cashier of the Bank of the United States in the words and figures following:

"(5) A. 10,363.                    A. 10,363.    (5)
"Cashier of the Bank of the United States,
"Pay to Thomas Mather, or order, Five
                    Dollars.
"Office of Discount and Deposit, Mobile, the
                    13th day of Oct. 1829.
"Geo. Poe,              Philip M'Closkey,
        Cashier.                    President.
        "Fairman, Draper, Underwood & Co."
Indorsed: "Pay the bearer, Thomas Mather."

—knowing the same to be false, forged and counterfeited with intent to defraud the Bank of the United States.

On the trial it was objected by Mr. Brashier and D. P. Brown, for defendants, that the order laid in the indictment was not within the law, and that the indictment could not be sustained, because the offence was not laid to be with the intent to defraud the person to whom the order was passed. Among other questions which arose on the evidence was this: several witnesses by the name of Burke testified to the presence of a person by the name of Rush at the time of passing the order in question, in which they are contradicted by a number of witnesses for the defendant. It was contended by the defendant's counsel that they were perjured if they swore rashly and inconsid-

[1] [Reported by Hon. Henry Baldwin, Circuit Justice.]

erately, though according to their belief, if their evidence was untrue in relation to the presence of Mr. Rush, they were not to be believed, and relied on the case of [Com. v.] Cornish, 6 Bin. 249.

Mr. Dallas, defendant's attorney, contended, that perjury consisted in swearing falsely and corruptly, contrary to the belief of the witness.

BALDWIN, Circuit Justice (charging jury). The counsel of the defendant has presented to the court the question, whether the orders or checks of a president of a branch Bank of the United States, drawn on the cashier of the mother bank, come within the meaning of the words "order or check," mentioned in the eighteenth section of the law incorporating the bank. The point has not been argued, but it has been made. It arises necessarily, is vital to the prosecution, and must be decided by the court. The words of the law are very plain, "or any false, forged or counterfeited order or check upon the said bank or corporation or any cashier thereof," broad enough to embrace this paper, which on its face purports to be such an order, and if genuine, would be one, or any order or check on the bank or any of its cashiers at the branches or here, or any draft or bill for the payment of money, which in law would be deemed an order or check. Is this comprehensive description narrowed by any other parts of the law? We find in it no prohibition direct or indirect against issuing this kind of paper either by the bank or any of its branches, or any word or expression by which congress has excluded it from the purview of the eighteenth section; neither can we perceive any thing in its nature which would justify such inference. The only restriction on the issuing of any paper, is in the proviso to the twelfth fundamental article in the eleventh section of the charter. The bank can make no bill obligatory or of credit under its seal for the payment of a less sum than 5,000 dollars; the bills or notes issued by order of the corporation, signed by the president and cashier, are made as binding and obligatory on the bank as those of private persons, but all their bills and notes must be payable on demand, unless of a sum not less than 100 dollars, and payable to order; none of these restraints apply to an order or check: the notes or bills alluded to are such as contain a promise to pay money, and the bills obligatory are such only as are under seal, and for sums not less than 5,000 dollars. The bank is left free to contract debts by any other mode than by their promissory note or an obligation under seal, with no other limitation than is contained in the eighth fundamental article, which is merely as to amount, the only effect of which, is not to exempt the bank from liability for the excess, but to make the directors, under whose administration it shall happen, per-

sonally liable. The words of this article are, in our mind, very conclusive on this point. "The total amount of debts which the said corporation shall at any time owe, whether by bond, bill, note, or other contract, over and above the debt or debts due for money deposited in the bank, shall not exceed the sum of 35,000,000 dollars," &c. This is an explicit declaration that the bank may make, and are bound by contracts other than those by bond, bill, note or deposit. These other contracts must be taken to mean and be co-extensive with ordinary transactions of banks. We certainly cannot confine them to limits narrower than those subjects which the charter recognises as those on which the bank are to act. Deposits, discounts, drawing, indorsing, buying, selling bills of exchange, or taking them for collection, dealing in gold or silver bullion, paying for buildings, improvements, salaries and contingent expenses, are "other contracts," by which the bank may incur debts, and are bound to pay them to any amount to which they may be contracted by them or under their authority. In all these operations, checks or orders on the bank or its cashiers, are indispensable to conducting the business of the bank. They are peculiarly so when we consider the connection between the bank and the government and its branches. Being the depositories of the public money,—bound to transfer it without charge or commission from the place where it is received to the place where it is wanted or required to be deposited,—bound to distribute the money of the government among its creditors,—to pay the salaries of public officers,—to act as commissioner of loans in the different states, in the payment of the public debt and pensions,—there must of necessity be drafts, orders and checks by the bank on its branches, and by the branches on each other, and on the bank. The branches are offices of discount and deposit. Independently of the duties enjoined on them by the charter, for the convenience of the government, there were great and powerful reasons for the incorporation of the bank, and the establishment of its branches, to create and continue a sound, uniform currency, facilities for internal exchange and remittance. It cannot be contended that drafts, orders or checks, drawn by or on the bank, or any branch, are not legitimate means by which all these objects, both public and private, could be accomplished, or that they can be accomplished without them. There is no pretence that there is any express or implied prohibition making them unlawful, and no good reason can be assigned why the bank, individuals and the public should not have the same protection against any injury which might result from their being forged or circulated, as the promissory notes of the bank, or the drafts, orders, or checks of individuals upon a cashier of the bank. It is, in our opinion, no answer to these views, that the law has not expressly

authorized the officers of the branches to draw on the bank: it is enough for this point that they are not prohibited from doing so: it is an act indispensable to the transaction of their ordinary business, in order to meet the wants of the public and others. The bank may contract otherwise than by bond, note, or bill. They may authorize the branches to draw orders, checks, or bills upon them, whether in funds or not, —but authorized or not, the paper has the same validity; if genuine, the drawer or drawee is bound for payment. It would be introducing a new principle into our code of criminal law, to say that the guilt or innocence of the accused would depend on the fact of the person in whose name a paper is forged having funds or authority on which he could draw his order or check. If a genuine bill is wanting in some requisite to give it currency, as the indorsement of the payee when payable to order—or if a positive law directs that besides the proper signatures, some other act should be done to give it any validity between the parties or to permit it to be read in evidence—as that it should be stamped—the crime of forgery is as complete by forging or knowingly passing it before indorsed or stamped, as after. Bailey, Bills, 442 (Am. Ed.) 382; U. S. v. Mitchell [Case No. 15,787].

To save the party from the penalty on account of the invalidity of the paper if genuine in fact, it must be shown to be wholly illegal and void in its operation, so that no one could be injured by its being forged or passed upon him. The genuine paper must be as worthless as its counterfeit. The law embracing then all orders or checks on the bank or any cashier thereof, with intent to defraud the bank or any other person, containing no exceptions, excluding no paper which comes within the definition or common acceptation of an order or check, or prohibiting the issuing or circulation of those drawn by the presidents of branches, we are bound to declare them to be within the words, spirit and meaning of the law, equally with the notes of the bank or the checks or orders of individuals. You will therefore understand us as distinctly laying down the law to be, that it is criminal to forge or pass paper of this description.

The next question of law which arises in the case is, whether that part of the indictment which charges that the accused passed the order or check in question, with intent to defraud the Bank of the United States, has been made out. On this part of the case the law is well settled; the indictment must allege the offence to have been committed with the intention of defrauding some person or corporation, and this allegation must be proved as laid. This is the general rule, but it must be taken with this qualification. If the person in whose name a forged note, bill, order or check is drawn, or the one on whom it is drawn, would, if genuine, be bound to pay it, the law infers and takes as proved the intention to defraud and injure such person, from the act of forging, or knowingly passing such paper. Bailey, Bills, 442 (Am. Ed.) 386; Russ. & R. 169, 291, 292; 2 Taunt. 333, 334. It is not necessary that there should be any actual injury sustained or fraud practised in fact, on the person who was the subject of the meditated fraud or injury; this part of the offence consists in mere intention, and if that intention can be consummated the offence is complete. It is enough that it may probably or possibly be done. 2 Strange, 749; 2 Law Rep. 1469; 2 W. Bl. 787; U. S. v. Moses [Case No. 15,825]; 2 Taunt. 333. The passing of this order or check is alleged to be done with intent to defraud the Bank of the United States; it therefore becomes necessary for us to inquire whether the bank might or could be defrauded or injured if the paper was genuine. By the fourteenth fundamental article of the charter of the bank, it is bound to establish branches in certain cases. It is authorized to establish them wheresoever they think fit, within the United States, and to commit the management and the business thereof to such persons and under such regulations as they may think proper, not being contrary to law or the constitution of the bank; or instead of establishing branches, they may employ other banks, with the approbation of the treasury, to manage the business proposed, other than for the purposes of discount, under such agreements and under such regulations as they may deem just and proper. It thus appears that the branches are legitimate emanations from the parent bank, who may commit their management to such persons, and subject to such regulations as they think proper, under no other limitations to their power than the laws of the land and their own charter. The operations of the branches are carried on with the funds of the corporation by officers of its appointment, and under its regulations; they are its agents, capable of binding it by their contracts; all their transactions are for the benefit of the bank, who cannot disavow them unless in a clear case of an excess or abuse of their powers; under such circumstances as would invalidate the contract of an agent of any other corporation or an individual. Any business may be done at the branches in relation to discounts and deposits which may be done at the parent bank; it is liable to depositors for all balances due at the branches, for all drafts, orders or checks drawn by its officers on their own cashier, by their own authority.

The act of establishing a branch, is, per se, the creation of an agency; it is an authority not only to the extent of the regulations under which their agent acts, but to the extent of all acts and transactions of the officers of the branches which the bank have been in the habit of adopting and confirming, on the same principle that individuals are liable on

the contracts of their wives and servants, who have been permitted to deal on their credit, and in their names; or a merchant, whose clerk is in the habit of writing letters, signing notes, bills and checks in his name, though without any written or express authority, by the adoption and recognition of which he authorizes the public to consider his clerk as his agent, authorized to do in future what he has been in the habit of doing with his knowledge and assent. It would be strange indeed that the bank should not be liable for checks or orders drawn by its agents at their own branches, which not only form a very important item in the currency of the country and the operation of the branches, but which the bank have for years daily ratified and sanctioned by their payment; the uniform course of business transacted between the bank and its branches, furnishes such a strong legal inference and presumption of its being authorized by the regulations under which they have been established, that the burthen of proof to the contrary is clearly thrown on the bank or any other person who would attempt to show that the paper was not obligatory upon them. It would be a severe reflection on the bank to suppose that they would for a moment refuse payment of these checks and orders, and our system of jurisprudence would deserve little of public respect or confidence if the law would not coerce it. But the charter is not silent. The eighth fundamental article makes the bank liable for all debts, though they exceed the amount limited; the fourteenth makes the offices of discount and deposit its agents; the sixteenth section makes the bank the depository of the public money, and imposes on it the obligation of transferring, distributing and paying it under the directions of the treasury; and by the seventeenth article, the bank is bound to pay in gold and silver all its notes, bills and obligations, and all deposits in the bank or its offices; and the proviso enacts, that congress may enforce and regulate the payment of other debts under the same penalties as are prescribed for the refusal to pay its notes, bills, obligations and deposits. The mode in which the bank contracts a debt, the shape it assumes, or the places where contracted, is of no importance. The offices being its agents, the debts contracted by them become the debts of the corporation, imposing a duty to pay them, which may be done at or by the branches or the bank. If the payment is made in coin, the debt is extinguished; if made by a draft, order or check, the debt remains until they are actually paid. Unless the holder expressly takes them as payment, and at his own risk, they create a new duty or obligation, which the bank is as much bound to perform as the old one for which it is intended to make satisfaction. It is a matter of mutual convenience, whether the old debt or duty shall be extinguished by payment or taking paper, whether in the promissory notes of the bank,

or orders or checks drawn upon it. They may be in large drafts or orders for remittance, or small ones for currency or circulation, and in any form, with or without ornaments, devices, or marks. Whether they resemble in these particulars the notes of the bank, is immaterial; their substance and legal effect are the same; they create a new debt or duty obligatory on the bank. It is bound to honour all the paper which it issues or gets into circulation by its authority or agents. Paper of the kind now under consideration, can be put into circulation in no other way than by being issued in payment of a debt or other equivalent. If, on the requisition of the treasury, an officer of the branch at a place in which public funds were deposited, should draw his order on the cashier of the bank or any branch at a place to which it was required to transfer them, or in distributing the public money among public creditors, and disbursing officers of the government, paying salaries, pensions, or the public debt, should as a matter of mutual convenience and consent, give drafts, orders, or checks, either for remittance or circulation, on the bank or another branch, the bank would be as much bound to pay them as they would to pay the same amount to an officer or creditor of the government, who would deposit to his own credit the amount thus received through the bank. The same rule would apply to an individual depositor, a creditor of the bank, or one who had an order or check on them, and would receive payment in the shape of branch orders; so, if a branch makes a contract of discount, and pays the proceeds by drafts on the bank, or any other kind of paper to suit their convenience, these obligations necessarily result from the contracts of deposit and discount. But there is another contract equally binding, that of purchase and exchange. An individual desirous of procuring a medium of remittance or circulation, exchanges with a branch his gold, silver, or any paper which they accept, as an equivalent for their drafts, orders or checks, large or small, as the case may be; stands in the same position to the bank as a previous creditor, depositor or holder of any demand upon them. He pays his money into the coffers of the bank, who receive it from their agents as the product of the contract made by their drafts and orders, all the profits of which go directly to the bank. To refuse payment in any of these cases, would be a fraud too palpable to be tolerated—wholly repugnant to every dictate of justice and rule of law.

The bank then being liable to pay paper of this description, if genuine, it follows that the forging or knowingly passing it, could and might be intended, and operate to defraud the bank. This raises the legal inference and presumption that such was the intention of the accused. When the law infers or presumes a fact, or an intention as resulting from the evidence, a jury may and ought to find it as if it was in direct proof before

them; the inference and presumption of the payment of a bond after twenty years, without demand or payment of interest—the existence of a deed of land after thirty years' possession—the malicious intent which is implied from the act of speaking or publishing scandalous words in civil cases—the inference of malice aforethought which the law draws from the unlawful killing of another not explained—the inference of larceny from a man being found in the possession of stolen goods and not accounting for them; and what you have heard in this case, the legal presumption of the accused knowing the order in question to be forged, drawn from his having passed another forged order of the same description, are among the familiar cases where a jury ought to and will take legal inferences, when not rebutted by positive testimony. The jury will so view it in this case, and though they may think that there is direct evidence of the intention to defraud Burke, and that he was actually defrauded, and the indictment would be sustained if it was so laid, yet it does not follow that there was not also an intention to defraud the bank. In our opinion, the facts of the case amount to an intention to defraud both Burke and the bank; that the indictment would be good in law, and supported by the evidence, if the offence was said to have been done with the intent to defraud either or both, and therefore instruct you that the allegation of the indictment in this particular is sufficient in law, and made out by the evidence if you believe the witnesses.

An important question on the evidence has arisen in this case on which we deem it necessary to give you our opinion. It has been contended by the counsel for the prisoner, that if you shall believe that Mr. Rush was not present at the races, that Burke and others who have sworn to his being there, and to his identity, are perjured if they have done so rashly, without knowledge, or using proper means of obtaining it, though they may believe in the truth of what they attest. To this position we cannot assent; with all possible respect for the private and judicial character of the learned judge, who pronounced the opinion of the supreme court of this state in the case referred to, we feel bound to express our decided dissent to the decision given. The statute (5 Eliz. c. 9; 2 Ruff. 549; 3 Inst. 163) adopted in Pennsylvania in 1718 (1 Dall. St. Laws, 143) makes it of the essence of the offence of perjury, that it be committed "wilfully" and "corruptly." Such are the very words of the law, which in our minds are not and cannot be taken as synonymous with "rashly" and "inconsiderately" swearing as the belief of the witness prompts him. His negligence or carelessness in coming to that belief or conclusion of the mind, without taking proper pains to enable him to ascertain the truth of the facts to which he swears, does not make his oath corrupt, and perjury cannot be wilful where the oath

is according to the belief and conviction of the witness as to its truth. It could not be asserted, consistently with any legal principle, that an indictment for wilful and corrupt perjury could be sustained, by proof of a witness having sworn rashly and inconsiderately to what he believed to be true. The case in 6 Bin. 249, is supported by only one decision, and that in the star chamber. 3 Inst. 166. We should be sorry to follow in this court the precedents of that in criminal prosecutions, and deem it unnecessary to apply to their proceedings, any other remarks than those which fell from the greatest common law lawyer in Westminster hall (Justice Yeates). "Next we are told of some proceedings in the star chamber, a court the very name whereof is sufficient to blast all precedents brought from it." 4 Burrows, 2373.

On this subject we therefore give you our most decided opinion, that you cannot be justified in imputing perjury to the witnesses, who have sworn to the presence of Mr. Rush on the race ground and to his identity in court, unless you shall believe, not only that Rush was not there, and that the fact is contrary to their oath, but that they swore wilfully and corruptly, contrary to their belief of the truth, whether they did so, is a matter for you to judge. It is in our opinion of infinite importance in this case for you to decide with the utmost deliberation on this point, as we think the prosecution mainly turns upon it. If in your opinion the Burkes have committed wilful and corrupt perjury, touching any thing in this case materially affecting the guilt or innocence of the accused, they are wholly unworthy of credit as to any other matter; a witness perjured as to one fact, ought not to be believed in any other. This we do not say to you as matter of law, for you may believe him in other respects if you will. But if we should in any such case, pass sentence on a prisoner convicted on such evidence, it would be with great reluctance, and little satisfaction with our administration of the penal justice of the union. On the other hand, if you should think these witnesses testified under a belief in the truth of their story as to Rush, you would probably not think it would be doing them or yourselves justice in disbelieving such facts of their evidence, as were not contradicted, disproved, or explained by the accused. If you should believe they swore rashly and inconsiderately as to one material fact, it might very properly give such a tinge to all they said, as to induce you to take their relation of other facts with great allowance, but would not justify you in wholly rejecting it. In making up your opinion on this part of the case, you must remember that an indictment is depending against Mr. Rush; we would recommend to you, not to examine very closely into the evidence which bears on his presence on the race ground; for the purposes of this trial, it is better to consider that in this respect, the witnesses on the part of the United States are

at least mistaken, and decide on the case of the prisoner on that supposition. In making this suggestion, however, you will not consider us as expressing our opinion on the weight of evidence, so far as it applies to Mr. Rush, it is due to him and the United States to suspend any opinion.

Verdict, guilty.